BOARD OF EDUCATION & others[1] vs. ASSESSOR OF
WORCESTER & others.[2]

Suffolk.    May 8, 1975. — August 18, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, KAPLAN, & WILKINS, JJ.

*Statute*, Construction.    *School and School Committee.*

Following enactment of St. 1972, c. 766, creating newly conceived
    and expanded programs for children with special education needs,
    the "special education grants" appropriated to cities and towns by
    St. 1974, c. 431, §§ 2 and 24 "[i]n order to meet the costs to be
    incurred . . . in the implementation of . . . [St. 1972, c. 766],"
    were meant for use only on such programs, and not for use in the
    mere continuation of special education programs supported in prior
    years; the excess of a grant to a city pursuant to St. 1974, c. 431,
    over the portion of the city's total special education budget desig-
    nated for new and expanded programs to implement St. 1972,
    c. 766, must be deposited in a separate special education account
    for implementation of such programs, and not be applied to re-
    duce the current tax rate of the city.    [511-517]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on February 21, 1975.

The case was reserved and reported by *Wilkins*, J.

*Robert M. Bonin*, Assistant Attorney General, for the
Board of Education & others.

*Richard W. Murphy* for the School Committee of
Worcester.

*James A. Brett*, Assistant City Solicitor, for the Assessor
of Worcester & others.

---

[1] Additional plaintiffs are the Commissioner of Education and the
Treasurer of the Commonwealth.

[2] Other defendants are the treasurer of Worcester, the city council
of Worcester and the city of Worcester.

*Jeffrey M. Freedman,* for Massachusetts Teachers Association & another, amici curiae, submitted a brief.

TAURO, C.J.    This is an action for declaratory relief brought pursuant to G. L. c. 231A wherein the Board of Education (board) seeks to have the obligations of the treasurer and assessor of Worcester declared with regard to monies appropriated by St. 1974, c. 431, §§ 2 and 24, for special education programs.[3]   The board also seeks an order compelling the city to furnish certain monies so appropriated to the treasurer to be held as a separate special education account.   The matter was heard by a single justice of this court, who reserved and reported it to the full court.

Briefly, the facts are these: St. 1974, c. 431, allocated $983,322 to the city of Worcester for implementation of St. 1972, c. 766.   Prior to that time, the Worcester school committee (committee) budgeted $2,366,000 for special education, of which $268,541 was for new and expanded programs to implement c. 766.   After being advised by

---

[3] Statute 1974, c. 431, § 2, contained line item 7028-0304 of $26,000,000 "[f]or special education grants to the cities and towns." Section 24 of the statute provided, in part, "In order to meet the costs to be incurred by the cities and towns *in the implementation of* . . . [St. 1972, c. 766] each city and town shall receive . . . a special education grant. . . . On or before November twentieth, nineteen hundred and seventy-four, the state treasurer shall pay to each city or town the amount indicated in the following schedule: . . . Worcester [$]983,322 . . .. The amount granted herein to each city or town shall be held as a separate account by the treasurer of such city or town and shall be expended by the school committee of such city or town for special education programs pursuant to . . . [G. L. c. 71B] without further appropriation . . . provided, that' where appropriations have been made in cities and towns to implement the provisions of said . . . [c. 766], the amount by which the grant to each city or town as set forth in this section exceeds the amount appropriated shall be available as hereby authorized without further appropriation.   In such instances, that portion of the grant that represents the amount appropriated shall be applied without further authorization by the board of assessors to reduce the current tax rate of such city or town" (emphasis added).   Chapter 766, Acts of 1972, was intended to provide educational programs for children with special needs.

the Department of Education that the entire $983,322 was to be spent for new programs, the committee made additional financial commitments for new and expanded programs.

The city treasurer, on receipt of a check for $983,322, was advised by the Worcester school department that the money should be deposited in a separate special education account. However, the money was used instead, on advice of the assessor, to reduce the tax rate for the 1975 fiscal year, and was not placed in a special education account.

The issue thus presented is whether monies allocated by St. 1974, c. 431, for implementation of St. 1972, c. 766, must be spent for new and expanded programs over and above those supported in prior years, or whether such monies may be used to reduce the tax rate where the total special education budget of a particular city exceeds the amount so allocated. We hold that the clear intent of c. 431 is that funds allocated thereby are to be spent only for new and expanded programs to implement c. 766.

In construing statutes, "[t]he general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Industrial Fin. Corp.* v. *State Tax Comm.* 367 Mass. 360, 364 (1975), quoting from *Hanlon* v. *Rollins,* 286 Mass. 444, 447 (1934). Accord, *Lincoln-Sudbury Regional Sch. Dist.* v. *Brandt-Jordan Corp. of New Bedford,* 356 Mass. 114, 117-118 (1969). See *Interstate Engr. Corp.* v. *Fitchburg,* 367 Mass. 751, 757 (1975). Additionally, where two or more statutes relate to the same subject matter, they should be construed together so as to con-

stitute a harmonious whole consistent with the legislative purpose. *Hardman* v. *Collector of Taxes of No. Adams,* 317 Mass. 439, 442 (1945). *School Comm. of Gloucester* v. *Gloucester,* 324 Mass. 209, 212 (1949). *Mathewson* v. *Contributory Retirement Appeal Bd.* 335 Mass. 610 (1957). See Sands, Sutherland Statutory Construction, § 51.01 (4th ed. 1973). Thus, in determining how the monies allocated by c. 431 may be spent, we must examine that statute with regard to its history as well as with reference to c. 766 and its underlying purposes.

The legislative purpose in enacting St. 1972, c. 766, is clear. Section 1 of the statute states in part, "it is the purposes of this act to provide for a flexible and uniform system of special education program opportunities for all children requiring special education; to provide a flexible and nondiscriminatory system for identifying and evaluating the individual needs of children requiring special education; . . . and to prevent denials of equal educational opportunity . . . in the provision of differential educational services."

The Legislature recognized that the act was necessary "to remedy past inadequacies and inequities," and that this could be done "by defining the needs of children requiring special education in a broad and flexible manner." St. 1972, c. 76, § 1. While c. 766 incorporated what had been fragmented attempts to deal with special education needs, and in doing so repealed the prior sections,[4] it is clear that the overriding purpose of the legislation was to initiate new and innovative special education programs with expanded screening and evaluation procedures and more realistic placement alternatives. G. L. c. 71B, §§ 1-4.

---

[4] Statute 1972, c. 766, §§ 8 and 10, repealed G. L. c. 69, §§ 26, 27, 28, 28A, 28B, 29, 29A-29E, 32-34, and G. L. c. 71, §§ 46-46B, 46D-46F, and 46H-46M. Revised versions are found in the new G. L. c. 71B, §§ 3, 4, 5, 8, 10, 11, 13, 14, inserted by St. 1972, c. 766, § 11, and G. L. c. 15, § 1M, inserted by St. 1972, c. 766, § 2.

The Legislature recognized, however, "that professional services and resources must be made available to cities, towns and regional school districts . . . if this act is to be implemented successfully" (c. 766, § 1), and, with this in mind, enacted St. 1974, c. 431, §§ 2 and 24. As stated, that statute provided funds "[i]n order to meet the costs to be incurred . . . in the implementation of . . . [c. 766]."

The defendant herein argues that, since the newly enacted c. 766 incorporates former provisions for special education programs, funds allocated by c. 431 may be used to reduce the tax rate in Worcester since that city's total special education budget exceeds the amount of its grant. The defendant further contends that a logical reading of c. 431 does not limit the grant to new and expanded programs. We do not find this analysis persuasive.

The entire thrust of c. 766 is the establishment of a comprehensive and complete program of evaluation and placement for children with special education needs. The statute takes a completely novel and innovative approach toward evaluating the needs of, and providing necessary services for, these children. The hallmark of the statute is its creativity and the new and expanded programs it provides. These innovative programs have become synonymous with c. 766 itself. Thus, we believe that the money allocated for implementation of c. 766 was meant for use only on these newly conceived and expanded programs, and not for use in the mere continuation of special education programs existing in the past.

Two additional factors support this conclusion. The application and interpretation of statutes by the agency charged with their enforcement, although not binding on us, is entitled to our consideration. *Assessors of Holyoke* v. *State Tax Commn.* 355 Mass. 223, 243-244 (1969). *Town Crier, Inc.* v. *Chief of Police of Weston,* 361 Mass. 682, 687, fn. 6 (1972). *School Comm. of Springfield* v.

*Board of Educ.* 362 Mass. 417, 441, fn. 22 (1972). *Devlin* v. *Commissioner of Correction,* 364 Mass. 435, 439 (1973). "The appropriate weight [of such interpretation], in a particular case, will depend on a variety of factors, including whether the agency participated in the drafting of the legislation (*Zuber* v. *Allen,* 396 U. S. 168, 192 [1969]), whether the interpretation dates from the enactment of the legislation, and whether it has been consistently applied (*Cleary* v. *Cardullo's, Inc.* 347 Mass. 337, 343-344 [1964])." *School Comm. of Springfield* v. *Board of Educ., supra.* In the instant case, the Department of Education sent a memorandum to local superintendents of schools shortly after enactment of St. 1974, c. 431, embodying its interpretation thereof. The department, which had been closely involved with the new legislation, interpreted c. 431 as providing funds "to support special education programs over and above those supported during the 1973-1974 school year," and thus as applying only to new programs.[5] The department has consistently adhered to this view, and although not of long standing, we believe this interpretation is entitled to some weight. *Devlin* v. *Commissioner of Correction, supra.*

Even more persuasive is a report prepared by the office of the Secretary of Education entitled "Projected Initial Cost of Chapter 766." This study was undertaken to determine how much local education agencies could expect implementation of St. 1972, c. 766, to cost in its initial year. It determined that an increase in special education costs of $40,000,000 could be estimated for the 1975 fiscal year, of which $14,000,000 reflected antici-

---

[5] The defendant argues that the relevant interpretation here is that of the Commissioner of Corporations and Taxation, and not the Commissioner of Education, as we are construing a statute involving budget and tax rate. However, our decision here involves the educational policy underlying both c. 766 and c. 431, and we believe the official opinion of the Commissioner of Education, who has broad powers in this area (c. 69, § 1; see *New Bedford* v. *Commissioner of Educ.* 349 Mass. 410, 414 [1965]) is more relevant to our inquiry.

pated growth of existing programs. Thus, the report concluded that "$26 million represents expected *additional* costs of Chapter 766" (emphasis added).[6]

This report was used by the Legislature in deriving the $26,000,000 figure for insertion into line item number 7028-0304 in place of the $9,000,000 recommended by the Governor. As such, it "comprise[s] a most instructive source for information indicative of what the legislature intended . . . [the statute] to mean." Sands, Sutherland Statutory Construction, § 48.04 (4th ed. 1973). The obvious import of this report is that the money allocated by c. 431 is to be used for new and expanded programs only. It was not intended as a reimbursement for past expenditures on special education programs, and certainly was not meant to reduce the tax rate in the circumstances of this case.

In light of what we have said, a judgment is to enter (a) declaring that the moneys appropriated by St. 1974, c. 431, §§ 2 and 24, are to be used only for the implementation of new and expanded programs in compliance with St. 1972, c. 766, and (b) ordering that the portion of the funds allocated to the city of Worcester not already budgeted by the school committee for new and expanded programs, in this case $714,781, be returned to the city treasurer for deposit in a separate special education account.

*So ordered.*

---

[6] The additional costs of c. 766 for which c. 431 funds may be expended include those new aspects of special education programs not existing in the past. Illustrative of these are the hiring and training of support personnel such as resource room teachers, generic teachers, special class teachers, diagnostic prescriptive teachers, para-professional tutor aides, perceptual specialists, curriculum specialists, speech and language specialists and guidance and adjustment counselors, among others; the hiring of or consultation by doctors, psychologists and social workers in the full core screening and evaluation process; the substantial retraining and in-service training of teachers with special-needs children in their classes; and the provision of specially equipped transportation facilities required by the statute.